# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | |
|---|---|
| **MARCIA C. AKERS,**[1]        ) | |
|     Plaintiff,           ) | |
|                   ) | |
| v.                   ) | Civil Action No. 2:07cv00067 |
|                   ) | **REPORT AND** |
|                   ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE,**     ) | |
|  **Commissioner of Social Security,**  ) | By:   PAMELA MEADE SARGENT |
|     Defendant.         ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

Plaintiff, Marcia C. Akers, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claim for supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 1381 *et seq.* (West 2003 & Supp. 2008). This court has jurisdiction pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

---

[1]It appears that the correct spelling of the plaintiff's name is Marcie C. Akers. However, the Complaint filed in this matter is titled *Marcia C. Akers v. Commissioner of Social Security.*

-1-

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Akers protectively filed her application for SSI[2] on July 24, 2003, alleging disability beginning July 24, 2003,[3] due to hepatitis C, high blood pressure, weakness in her upper extremities, fainting spells, migraines and depression. (Record, ("R."), at 92, 161-64, 166, 205.) The claim was denied initially and on reconsideration. (R. at 134-36, 140-42, 143.) Akers then requested a hearing before an ALJ. (R. at 146.) The ALJ held a hearing on October 12, 2005, at which Akers was represented by counsel. (R. at 89-131.)

By decision dated November 23, 2005, the ALJ denied Akers's claim. (R. at 68-80.) The ALJ found that Akers had not engaged in any substantial gainful activity since her alleged onset date. (R. at 79.) The ALJ found that the medical evidence

---

[2] The record indicates that Akers filed a previous application for SSI, which was denied by an Administrative Law Judge, ("ALJ"), in August 2002 and by the Appeals Council in July 2003. (R. at 91, 449.) The claim was appealed to this court and the ALJ's decision was affirmed on November 10, 2004. (R. at 91.) The record does not contain any information pertaining to this claim.

[3] Akers's SSI application gives an onset date of disability of December 18, 2000. (R. at 161.) Akers's onset date was amended to July 24, 2003, at her administrative hearing. (R. at 92.)

established that Akers had a severe combination of impairments, namely hypertension, hepatitis C, status post fixation of the right arm, status post ulnar surgery of the left elbow, occasional migraines and depression, but she found that Akers's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 79.) The ALJ found that Akers's allegations regarding her limitations were not totally credible. (R. at 79.) The ALJ also found that Akers had the residual functional capacity to perform medium work,[4] which did not require repetitive work with her upper extremities more than two-thirds of the time, work with food or the public or more than simple, easy-to-learn tasks. (R. at 77, 80.) The ALJ found that Akers was unable to perform any of her past relevant work. (R. at 80.) Based on Akers's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed that Akers could perform, including jobs as a cashier and an inventory stock clerk. (R. at 80.) Therefore, the ALJ found that Akers was not under a disability as defined in the Act at any time through the date of her decision, and that she was not eligible for benefits. (R. at 80.) *See* 20 C.F.R. § 416.920(g) (2008).

After the ALJ issued her decision, Akers pursued her administrative appeals, (R. at 64), but the Appeals Council denied her request for review. (R. at 5-8.) Akers then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 416.1481 (2008). The case is before this court on Akers's Motion for Summary Judgment filed on May 14,

---

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. § 416.967(c) (2008).

2008, and the Commissioner's Motion for Summary Judgment filed July 3, 2008.

*II. Facts*

Akers was born in 1960, (R. at 161), which classifies her as a "younger person" under 20 C.F.R. § 416.963(c) (2008). Akers has a high school education and past relevant work experience as an interviewer, a cashier and a dispatcher in the military. (R. at 93, 172.) Akers testified that she had been sober since October 2004, when she started the Virginia Alcohol Safety Action Program, ("VASAP"). (R. at 99-100.) She testified that she had been sober for more than a year. (R. at 102.) She stated that she felt better both physically and emotionally. (R. at 102.) Akers stated that since she married, she was looking forward to "living for a long time" and that her marriage was what convinced her to seek treatment for her alcoholism. (R. at 104.) She stated that her blood pressure was controlled with medication. (R. at 117.) She stated that she only occasionally had problems with depression and anxiety. (R. at 119.) Akers stated that she had not received mental health treatment since completing VASAP. (R. at 120.)

John Newman, a vocational expert, also was present and testified at Akers's hearing. (R. at 120-30.) Newman was asked to consider a hypothetical individual of Akers's age, education and work experience who had the residual functional capacity to perform medium work with no manipulative, visual, communicative or environmental limitations. (R. at 123-24.) Newman stated that such an individual could do Akers's past work. (R. at 124.) Newman was then asked to consider an

-4-

individual who could perform medium and light[5] work who could only occasionally perform repetitive work with her hands. (R. at 124.) Newman stated that there were no jobs available that such an individual could perform. (R. at 124.) Newman was then asked to consider the same individual who could perform medium or light work, who could perform repetitive work with her hands up to two-thirds of the time, who had a mild reduction in concentration and who could not work around foods that the public would consume or where body fluids could be transferred to the public. (R. at 124-25.) Newman stated that a significant number of light jobs existed that such an individual could perform, including jobs as a mail clerk, a cashier and a stock and inventory clerk. (R. at 125.) Newman was further asked to consider the same individual, but who was limited as indicated in the assessment completed by Dr. Sharat K. Narayanan, M.D. (R. at 125, 514-17.) Newman stated that there would be no jobs available that such an individual could perform. (R. at 125.)

In rendering his decision, the ALJ reviewed records from the University of Virginia Health System; Dr. Sharat K. Narayanan, M.D., an internist; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Michael J. Hartman, M.D., a state agency physician; Hugh Tenison, Ph.D., a state agency psychologist; R. J. Milan Jr., Ph.D., a state agency psychologist; Buchanan General Hospital; The Laurels; Cumberland Mountain Community Services; Dr. Brian Looney, O.D.; Dr. A. Jay Preslar III, M.D.; and Dr. N. Eryilmaz, M.D. Akers's attorney submitted records from Thompson Family Health Center, Colleen Green, P.A., a physician's assistant, and Dr.

---

[5]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can do light work, she also can do sedentary work. *See* 20 C.F.R. § 416.967(b) (2008).

Case 2:07-cv-00067-JPJ   Document 22   Filed 10/21/08   Page 5 of 19   Pageid#: 70

Dia Owens, M.D., to the Appeals Council.[6]

The record shows that Dr. A. Jay Preslar III, M.D., treated Akers from April 1996 through June 1996 due to a broken right hand. (R. at 345-50.) Akers underwent an open reduction and internal fixation of a fracture of the fourth metacarpal of the right hand. (R. at 345-50.) The record shows that Dr. Brian Looney, O.D., treated Akers for corneal abrasion and decreased vision from June 9, 2003, through June 26, 2003. (R. at 368-74.)

In July 2003, Akers had a history of treatment for various impairments, including hypertension, depression and chronic headaches. (R. at 219-33, 269-304.) Akers's medical history included surgical repair of a fracture of her right arm, surgical repair of a fracture of her right hand in 1996 and prior ulnar surgery of her left elbow. (R. at 219, 339, 345-49.) Dr. Sharat K. Narayanan, M.D., an internist at Stone Mountain Health Services, was Akers's primary treating physician.[7] In February 2002, Akers reported that her depression was stable. (R. at 300.) In March 2002, Akers reported that she had stopped consuming alcoholic beverages. (R. at 298.) She reported that her crying spells had completely resolved since taking Zoloft. (R. at 298.) In August 2002, Dr. Narayanan reported that Akers's depression was stable. (R. at 289.) In October 2002, an MRI of Akers's head was performed and was normal. (R.

---

[6]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-8), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

[7]Akers also was treated by Dr. Dia Owens, M.D., from October 2005 through September 2006. (R. at 523-38.)

at 230, 282.) In November 2002, Akers reported that she was doing well on Prozac. (R. at 278.)

In March 2003, Akers reported that Prozac had helped her symptoms of depression and had helped relieve her headaches. (R. at 273.) She reported that she was able to function effectively. (R. at 273.) In May 2003, Akers continued to report that she was doing well on Prozac. (R. at 271.) In July 2003, Dr. Narayanan reported that Akers had no complaints and was doing fairly well on her medications. (R. at 267.) Her hypertension was controlled, and her depression was stable. (R. at 267-68.) In February 2004, Dr. Narayanan resumed Akers's Prozac. (R. at 254.) In March 2004, Akers reported that she was doing well, and she had no complaints. (R. at 252.) Her physical examination was normal, and her depression was reportedly improved. (R. at 252.) In June 2004, Akers stated that she was doing much better with her depression and that she had not taken any Prozac for over two months. (R. at 504.) She also stated that she had not consumed alcoholic beverages for two months. (R. at 504.) Her physical examination showed no abnormalities. (R. at 504.) In December 2004, Akers denied any alcohol abuse, and she stated that her depression was much better. (R. at 501.) She also reported that her headaches were less frequent. (R. at 501.) In June 2005, Akers reported no new or acute complaints. (R. at 495.) Her depression was stable, and she no longer took Prozac. (R. at 495.)

On October 6, 2005, Dr. Narayanan completed an assessment indicating that Akers could not lift or carry items weighing more than five pounds. (R. at 515-16.) Dr. Narayanan stated that this assessment was supported by Akers's history of "nerve injury" with surgery to her left forearm and her history of fracture of her right

-7-

forearm. (R. at 515.) He indicated that Akers's abilities to stand, walk and sit were not impaired. (R. at 515.) Dr. Narayanan reported that Akers could frequently climb, stoop, kneel, balance, crouch and crawl, but that her abilities to reach, to handle, to feel and to push/pull would be affected. (R. at 516.) Dr. Narayanan stated that these restrictions were due to the nerve injury in her left arm and her complaints of pain in both arms. (R. at 516.) He indicated that Akers should avoid working around moving machinery. (R. at 516.) Dr. Narayanan also completed a mental assessment indicating that Akers had a seriously limited, but not precluded, ability to understand, remember and carry out complex and simple instructions and to maintain personal appearance. (R. at 514, 517.) He also indicated that Akers had no useful ability to make occupational, performance and personal-social adjustments in all other areas. (R. at 514, 517.)

On July 27, 2007, Dr. Owens completed an assessment indicating that Akers could not lift or carry items weighing more than five pounds. (R. at 647-48.) Dr. Owens stated that this assessment was based upon Akers's having "no strength in hands; drops things." (R. at 647.) She indicated that Akers could stand and/or walk for up to three hours in an eight-hour workday. (R. at 647.) She indicated that Akers had no problems with her ability to sit. (R. at 647.) Dr. Owens reported that Akers could occasionally perform postural activities, but that her abilities to reach, to handle, to feel, to pull and to see would be affected. (R. at 648.) Dr. Owens stated that these findings were supported by weakness in Akers's right arm and tingling in her left fingers. (R. at 648.) Dr. Owens also stated that it was hard for Akers to reach secondary to abdominal pain due to her liver disease. (R. at 648.) She indicated that Akers should avoid working around heights, temperature extremes, dust and humidity.

-8-

(R. at 648.)

Dr. Owens also completed a mental assessment indicating that Akers had an unlimited ability to follow work rules and to relate to co-workers. (R. at 649-50.) She indicated that Akers had a limited, but satisfactory, ability to use judgment, to interact with supervisors, to function independently, to understand, remember and carry out simple instructions, to maintain personal appearance, to relate predictably in social situations and to demonstrate reliability. (R. at 649-50.) Dr. Owens also indicated that Akers was seriously limited, but not precluded, in her ability to deal with the public, to deal with work stresses, to maintain attention and concentration, to understand, remember and carry out complex and detailed instructions and to behave in an emotionally stable manner. (R. at 649-50.)

In February 2002, Akers was diagnosed with mild hepatitis C. (R. at 298, 354.) She was monitored for this condition at the University of Virginia Health System, ("UVA"). (R. at 273-74, 354-64, 375.) In February 2003, Akers's hepatitis C was diagnosed as mild, and she had normal liver enzymes. (R. at 354.) In April 2002, Akers reported that she had not consumed alcoholic beverages since October 2001. (R. at 360.) In May 2003, Akers was seen at UVA for evaluation of chronic headaches. (R. at 351-53.) She reported experiencing up to eight headaches per month with the headaches lasting two to three days at a time. (R. at 351.) Akers reported that her depression was well treated with Prozac. (R. at 352.) She had normal bulk, tone and strength in both her upper and lower extremities. (R. at 352.)

On July 7, 2004, Akers was seen at UVA Department of Neurology for

evaluation of migraine headaches and chronic headaches. (R. at 506-08.) On examination, Akers appeared anxious and tense, but she engaged in conversation without difficulty. (R. at 506.) She had some action tremor with her arms extended, but no attention tremor. (R. at 507.) Her muscle strength was 5/5 in her upper and lower extremities, including her intrinsic hand muscles, wrist extensors and flexors. (R. at 507.) She also had volitional adduction of her fifth finger in her left hand, but on repetitive testing, she demonstrated full power in her hand and finger muscles. (R. at 507.) Akers had no sensory or reflex loss, and her coordination and gait were normal. (R. at 507.) By letter dated March 22, 2005, it was reported that Akers did not keep her appointments scheduled for September 8, 2004, and March 9, 2005. (R. at 505.) On February 24, 2006, Colleen Green, P.A., a physician's assistant at UVA, reported that Akers underwent a liver biopsy, which showed cirrhosis. (R. at 12-14, 25, 35-36.) Akers reported that she recently had not been on antidepressant medication and that she had been doing much better. (R. at 12.)

On December 15, 2003, Dr. Frank M. Johnson, M.D., a state agency physician, indicated that Akers had the residual functional capacity to perform medium work. (R. at 447-55.) No postural, manipulative, visual, communicative or environmental limitations were noted. (R. at 450-52.) This assessment was affirmed by Dr. Michael J. Hartman, M.D., another state agency physician, on July 13, 2004. (R. at 454.)

On December 15, 2003, Hugh Tenison, Ph.D., a state agency psychologist, indicated that Akers was moderately limited in her ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to complete a normal workday and workweek without interruptions

from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior, to respond appropriately to changes in the work setting, to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others. (R. at 456-59.) This assessment was affirmed by R. J. Milan Jr., Ph.D., another state agency psychologist, on July 13, 2004. (R. at 458.)

Tenison also completed a Psychiatric Review Technique form, ("PRTF"), indicating that Akers suffered from an affective disorder. (R. at 460-75.) Tenison indicated that Akers had moderate limitations in her activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 470.) He indicated that Akers had not experienced any episodes of decompensation. (R. at 470.) Tenison reported that Akers could perform simple, unskilled work. (R. at 472.) This PRTF was affirmed by Milan on July 13, 2004. (R. at 460.)

On January 14, 2004, Akers was admitted to Buchanan General Hospital for Tylenol overdose with suicidal ideation. (R. at 400-07.) Akers reported a history of alcoholism since age 15, and she stated that she drank up to one pint to one-fifth of Vodka a day. (R. at 405, 420.)

On January 16, 2004, Akers was involuntarily admitted to The Laurels[8] after she took a Tylenol overdose and made suicidal statements. (R. at 402-03, 419-22.) Akers was discharged on January 22, 2004, but her prognosis was poor due to her denial and extensive substance abuse history. (R. at 482-84.) Upon discharge, Akers's diagnosis was alcohol dependence with physiological dependence. (R. at 483.) Her then-current Global Assessment of Functioning score, ("GAF"),[9] was assessed at 50.[10] (R. at 483.) Akers was readmitted on February 19, 2004, due to suicidal ideations and substance abuse. (R. at 476-78.) She was discharged against medical advice on February 21, 2004. (R. at 477.) Her then-current GAF score was assessed at 55.[11] (R. at 477.)

On January 22, 2004, Akers was readmitted to Buchanan General Hospital because she intentionally overdosed on Prozac and alcohol. (R. at 378-87.) She was discharged the following day and referred to Cumberland Mountain Community Services, ("Cumberland Mountain"), for further evaluation and treatment of her alcohol dependence and depression. (R. at 414-18.) In follow-up visits with

---

[8]The record shows that Akers also was admitted to The Laurels on January 14, 2000, after being referred by family members secondary to substance abuse. (R. at 489-92.) She was discharged on January 15, 2000, against medical advice. (R. at 489.)

[9]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[10]A GAF of 41-50 indicates that the individual has "[s]erious symptoms ... OR any serious impairment in social, occupational, or school functioning ...." DSM-IV at 32.

[11]A GAF of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

Cumberland Mountain in February and March 2004, Akers reported not being ready to undergo detoxification. (R. at 410, 434, 444.) She stated that she was a "huge NASCAR race fan" and enjoyed drinking when a car race was on television. (R. at 427, 431, 442.) Akers also stated that she enjoyed gardening and took pride in being able to read the daily newspaper from cover to cover. (R. at 431, 442.) On April 1, 2004, Akers called Cumberland Mountain to cancel an appointment and stated that she was going to assist her new boyfriend with "laying tile and taking care of some jobs." (R. at 446.) On April 8, 2004, Akers appeared to be "glowing with happiness." (R. at 439.) She was stable, oriented, pleasant and cooperative. (R. at 439.) She reported that she was the happiest that she had ever been. (R. at 439.) She was involved in a positive, supportive relationship with a man. (R. at 439.) She reported that she had reduced her drinking from one-fifth of Vodka a day to two beers two days a week, plus a six-pack on the weekend. (R. at 439.) Akers stated that she was no longer taking Prozac because of her current happiness and her reduced alcohol intake. (R. at 439.) On May 12, 2004, Akers reported that she was getting married in August. (R. at 438.) She stated that she was "very happy." (R. at 438.) On May 26, 2004, Akers cancelled her appointment because she was going shopping for a wedding dress. (R. at 437.) There is no evidence of any further contact with Cumberland Mountain after this date.

### III. Analysis

The Commissioner uses a five-step process in evaluating SSI claims. *See* 20 C.F.R. § 416.920 (2008); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe

-13-

impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. § 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 416.920(a) (2008).

Under the analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 23, 2005, the ALJ denied Akers's claim. (R. at 68-80.) The ALJ found that the medical evidence established that Akers had a severe combination of impairments, namely hypertension, hepatitis C, status post fixation of the right arm, status post ulnar surgery of the left elbow, occasional migraines and depression, but she found that Akers's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 79.) The ALJ also found that Akers had the residual functional capacity to perform medium work, which did not require repetitive work with her upper extremities more than two-thirds of the time, work with food or the public or more

-14-

than simple easy-to-learn tasks. (R. at 77, 80.) The ALJ found that Akers was unable to perform any of her past relevant work. (R. at 80.) Based on Akers's age, education, past work experience and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed that Akers could perform, including jobs as a cashier and an inventory stock clerk. (R. at 80.) Therefore, the ALJ found that Akers was not under a disability as defined in the Act at any time through the date of her decision, and that she was not eligible for benefits. (R. at 80.) *See* 20 C.F.R. § 416.920(g).

Akers argues that the ALJ erred in evaluating the severity of her mental impairments. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-11.) Akers also argues that the ALJ erred by rejecting the opinion of Dr. Narayanan with regard to her physical impairments. (Plaintiff's Brief at 11-13.) Akers further argues that the hypothetical questions presented to the vocational expert did not accurately reflect her limitations. (Plaintiff's Brief at 13-14.)

Akers argues that the ALJ erred by rejecting the opinion of Dr. Narayanan with regard to her physical impairments. (Plaintiff's Brief at 11-13.) Based on my review of the record, I find that substantial evidence supports the ALJ's rejection of Dr. Narayanan's physical assessment. The ALJ recognized that Akers had a history of treatment for several impairments, but that her treatment history was inconsistent with the degree of limitation and pain that she alleged. (R. at 75.) Under 20 C.F.R. § 416.927(d), the ALJ must give controlling weight to a treating source's opinion if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence of record. In

this case, the ALJ rejected the opinion of Dr. Narayanan because it was not supported by the record. (R. at 73, 76.) In July 2003, Akers had a normal physical examination and was doing fairly well. (R. at 267-68.) She also had essentially normal physical examinations in follow-up visits with Dr. Narayanan in January 2004, February 2004, March 2004, June 2004, December 2004, February 2005 and June 2005. (R. at 252, 254, 259, 495-96, 501, 504.) In addition, other than being monitored regularly for hepatitis C and being intermittently prescribed medications for her hypertension and headaches, Akers's treatment for her physical impairments was fairly conservative and routine. (R. at 252-68, 495-96, 501-07.) The ALJ found that Akers was limited in the use of her upper extremities and that she was unable to use them continuously for repetitive work. (R. at 77.) While a UVA Neurology report in July 2004 showed that Akers had some adduction of her left fifth finger, she otherwise had normal muscle strength in her upper extremities and full power in her hand and finger muscles with repetitive testing with no evidence of any sensory or reflex loss. (R. at 507.) I find that this evidence supports the ALJ's rejection of Dr. Narayanan's assessment of Akers's physical residual functional capacity.

Akers argues that the ALJ erred in evaluating the severity of her mental impairments. (Plaintiff's Brief at 8-11.) The ALJ in this case found that Akers was limited to the performance of simple, easy-to-learn tasks. (R. at 77.) Based on my review of the record, I find that substantial evidence exists to support this finding. The record shows that with treatment and the cessation of alcohol abuse, Akers's symptoms of depression were stable. (R. at 102, 252, 267-68, 271, 273, 278, 289, 298, 300, 352, 495, 501, 504.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir.

-16-

1986). In addition, Akers admitted that her days were usually "normal" and that she only sometimes had bad days like everyone else. (R. at 119-20.)

As discussed above, the treatment notes from Dr. Narayanan and Cumberland Mountain show substantial improvement in Akers's mental condition once she complied with treatment and started reducing her alcoholic consumption. (R. at 431, 437-39, 446, 495-96, 501, 504.) Akers further argues that the ALJ was bound by the assessments completed by the state agency psychological consultants. (Plaintiff's Brief at 9-11.) Although an ALJ must consider the findings made by state agency consultants at the initial and reconsideration levels of review, an ALJ is not bound by such findings. *See* 20 C.F.R. § 416.927(f)(2)(i), (ii) (2008). In this case, the ALJ considered the state agency psychologists' assessments and rejected them because they were completed at a time when Akers was "still grappling with long-standing alcoholism," and they were completed before documentary evidence showed significant, sustained improvement in her condition. (R. at 73, 77.) Based on the above, I find that the ALJ properly weighed the medical evidence in determining Akers's mental residual functional capacity.

I do find, however, that the vocational expert's testimony provided in this case does not provide substantial evidence to support the ALJ's finding that there were other jobs Akers could perform. Testimony of a vocational expert constitutes substantial evidence only where his or her opinion is in response to a proper hypothetical question which accurately sets out all of the claimant's impairments. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). In this case, the ALJ found that Akers was capable of performing medium work not requiring repetitive work with her

upper extremities more than two-thirds of the time, work with food or the public or more than simple, easy-to-learn tasks. (R. at 77.) The hypothetical the ALJ presented to the vocational expert, however, did not include the restriction to simple, easy-to-learn tasks. (R. at 124-25.) Therefore, the vocational expert's testimony cannot provide substantial evidence to support the ALJ's finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists to support the ALJ's finding as to Akers's residual functional capacity;

2. Substantial evidence does not exist to support the ALJ's finding that other jobs existed which Akers could perform; and

3. Substantial evidence does not exist to support the ALJ's finding that Akers was not disabled under the Act.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Akers's and the Commissioner's motions for summary judgment, vacate the final decision of the Commissioner denying benefits and remand this case to the Commissioner for further consideration.

## Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(c) (West 2006):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     This 21st day of October 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE